IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **JEREMY C.**[1], | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:22-cv-00029 |
| | ) |
| **KILOLO KIJAKAZI,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

# REPORT AND RECOMMENDATION

Plaintiff Jeremy C. ("Jeremy") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act ("Act").[2] 42 U.S.C. §§ 401–433; 42 U.S.C. § 1381-1383f. Jeremy alleges that the Administrative Law Judge ("ALJ") erred by failing to properly assess his mental impairments and assess his allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 17) and **DENYING** Jeremy's Motion for Summary Judgment (Dkt. 15).

# STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] At the hearing before the ALJ, Jeremy withdrew his application for DIB. R. 190–91.

the Commissioner's conclusion that Jeremy failed to demonstrate that he was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Jeremy filed for DIB and SSI in October 2019, claiming that his disability began on August 1, 2011,[4] due to generalized anxiety disorder, unspecified bipolar and related disorder, alcohol use disorder, bipolar disorder, and hypertension. R. 206–07; 223–24. Jeremy's date last insured is September 30, 2011; thus, he must show that his disability began on or before this date

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[4] At the hearing before the ALJ, Jeremy amended the alleged onset date to October 24, 2019. R. 191.

2

and existed for twelve continuous months to receive DIB. R. 170; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Jeremy's applications at the initial and reconsideration levels of administrative review. R. 206–220, 223–49. On March 24, 2021, ALJ Jon Lyons held a hearing to consider Jeremy's claims for DIB and SSI. R. 187–204. Counsel represented Jeremy at the hearing, which included testimony from vocational expert Asheley Wells. On April 19, 2021, the ALJ entered his decision analyzing Jeremy's claims under the familiar five-step process[5] and denying his claims for benefits.[6] R. 19–34.

The ALJ found that Jeremy suffered from the severe impairments of bipolar disorder, alcohol induced mood disorder, and generalized anxiety disorder. R. 172. Regarding his physical impairments, the ALJ found that Jeremy's hypertension, obesity, asthma, and degenerative disc disease were non-severe. R. 173. The ALJ found Jeremy was mildly limited in the broad functional areas of understanding, remembering, or applying information, and adapting and managing oneself. R. 174. The ALJ found Jeremy was moderately limited in the broad functional areas of interacting with others and concentrating, persisting, or maintaining pace. Id.

---

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[6] Jeremy was 33 years old on his original alleged onset date and 41 years old on his amended alleged onset date, making him a younger person under the Act. R. 178.

The ALJ determined that Jeremy's mental and physical impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 173. The ALJ specifically considered listings 12.04 (depression) and 12.06 (anxiety-related disorders).

The ALJ determined that Jeremy retained the residual functional capacity ("RFC") to perform light work. R. 175. Jeremy is limited to simple and routine tasks in a stable environment without complex procedures, processes, or instructions. Id. He is not able to perform timed or production-paced work.[7] Id. Jeremy can have few changes in work processes, procedures, or environment. Id. He can have no more than occasional interactions with co-workers, supervisors, or the public. Id. The ALJ determined that Jeremy had no past relevant work, but that he could perform jobs that exist in significant numbers in the national economy, such as laundry worker and price marker. R. 178–79. Jeremy appealed the ALJ's decision, and the Appeals Council denied his request for review on December 16, 2021. R. 1–3.

## ANALYSIS

Jeremy alleges that the ALJ failed to properly assess both his mental impairments and his allegations regarding his symptoms.

**A. Medical History Overview**

1. Medical Treatment[8]

Jeremy's first record of a mental health diagnosis was in September 2014 as part of an initial evaluation at the Roanoke City Jail. Jeremy was diagnosed with alcohol dependence in

---

[7] The ALJ appears to have made a typographical error in his RFC. The ALJ says that Jeremy is "limited to simple and routine tasks in a stable work environment with complex procedures, processes, instructions, nor is able to perform timed or production-paced work." R. 175. Both Jeremy and the Commissioner noted the typographical error and stated that it should read, "limited to simple and routine tasks in a stable work environment with *no* complex procedures, processes, instructions . . . ." Pl.'s Br. at 17, Dkt. 16; Def.'s Br. at 9, Dkt. 18.

[8] Because Jeremy alleges that the ALJ erred in adequately considering his mental impairments only, I did not include a summary of his physical medical history and treatment in this opinion.

4

forced remission and mixed bipolar disorder. R. 501–03. The Roanoke City Jail physician prescribed Jeremy Depakote and Celexa. R. 503.

Jeremy received care at the emergency room several times beginning in 2016. In March 2016, emergency medical services transported Jeremy to the Roanoke Memorial Hospital after he was found unresponsive outside of a hotel. R. 447. Jeremy's blood alcohol level was 0.467%, and he was diagnosed with acute alcohol intoxication. R. 449–50. At an emergency room visit in November 2019, Jeremy reported that he drank a gallon and a half of whiskey daily. R. 584. Jeremy also visited the emergency room in December 2019, reporting that he lost consciousness after drinking alcohol. R. 572. His blood alcohol level was 0.400%. Id. Jeremy also used the emergency room to seek refills of his Lithium during this period. R. 584, 590, 593, 790.

Jeremy began services at Blue Ridge Behavioral Healthcare ("Blue Ridge") in October 2019. R. 684–86. Jeremy reported constant depression and anxiety at his first appointment. R. 684. He acknowledged his ongoing alcohol use and noted that he had alcohol in his soda bottle at the appointment. R. 688. Jeremy was diagnosed with generalized anxiety disorder, unspecified bipolar and related disorder, and severe alcohol use disorder and referred for psychiatric services. R. 681, 700. In December 2019, Jeremy returned to Blue Ridge for help completing his application for Social Security benefits. R. 718. During that appointment, Jeremy reportedly seemed unstable on his feet, smelled of alcohol, and had outbursts of random noises. Id.

In an undated letter, Kathleen Guilliams, a qualified mental health professional at Blue Ridge, concluded that Jeremy had extreme difficulty remembering things and interacting with others, and had some difficulty concentrating during appointments. R. 620. Ms. Guilliams noted

that symptoms of Jeremy's diagnoses include "depression, exaggerated self-confidence, racing thoughts, and anger." Id.

In February 2020, Jeremy saw Jessica Jeffrey, D.O., at Blue Ridge for a psychiatric evaluation. R. 919–21. Dr. Jeffrey could not complete a full review of Jeremey's symptoms because Jeremy became angry during the appointment and left. R. 920. Dr. Jefferey found that Jeremy's symptoms did not meet the clinical criteria for bipolar disorder. Id. Dr. Jeffrey diagnosed Jeremy with severe alcohol abuse and alcohol induced mood disorder. Id. Jeremy declined referral to a substance abuse program. Id. Jeremy did not return to Blue Ridge following this appointment, so he was discharged from services on September 23, 2020. R. 889.

Also in February 2020, Jeremy attended a consultative psychological evaluation with Martin Gardener, Ph.D. R. 772–77. Jeremy reported that he lived by himself, took care of his own apartment, shopped for groceries, cooked, and handled his own bills and finances. R. 773. Dr. Gardener found that Jeremy's long-term memory and fund of general information were mildly impaired. R. 775. Jeremy's immediate recall, recent memory, and computation skills were within normal limits. Id. Dr. Gardener also found that Jeremy "should have no impairment of concentration, persistence, or pace when attempting simple and repetitive work tasks." Id. Dr. Gardener diagnosed Jeremy with severe alcohol use disorder, moderate unspecified bipolar and related disorder with anxious distress, moderate posttraumatic stress disorder, and antisocial personality disorder. R. 776.

In April 2020, Jeremy saw Debra Marks, Psy.D., a licensed clinical psychologist, for a cognitive functioning evaluation. R. 778–89. Using the Wechsler Adult Intelligence Scale – IV, Dr. Marks concluded that Jeremy was low average in working memory, borderline in verbal comprehension, and extremely low in perceptual reasoning, processing speed, and general

6

abilities. R. 779. Dr. Marks diagnosed Jeremy with a mild intellectual disability and noted that he was "[a]ble to maintain independence with support." Id.

In April 2020, Jeremy began seeing Robert Hadley, P.A. R. 787–90. Dr. Hadley diagnosed Jeremy with bipolar 2 disorder and alcohol abuse disorder. R. 789. Dr. Hadley concluded that Jeremy's bipolar disorder did not "seem well-controlled." Id. At a follow-up with Dr. Hadley later that same month, Dr. Hadley noted that Jeremy had a "hard time following detailed instructions" and "ask[ed] for frequent repetition and clarification." R. 786. Dr. Hadley further noted that Jeremy's affect was "slightly hypomanic." Id. However, Dr. Hadley concluded that Jeremy's behavior, thought content, and judgment were all normal. Id. Dr. Hadley prescribed Seroquel in addition to Lithium for Jeremy's mental health diagnoses. R. 787. In May 2020, Jeremy saw Dr. Hadley again and noted that the Seroquel produced "intolerable sedation" and did not help with his moods. R. 1059. Jeremy reported depression, anger, anxiety, and mania repeating almost daily. Id. Dr. Hadley noted that Jeremy had "[r]apid speech and meandering train of thought, as in prior clinic visits" and that Jeremy's mood was "not adequately controlled." R. 1059–60. Dr. Hadley discontinued Seroquel and Lithium, prescribed Lamictal, and reiterated Jeremy's diagnosis of bipolar 2 disorder. R. 1060.

In August 2020, Jeremy began seeing Mohammad Nimer, M.D. R. 1071. Dr. Nimer diagnosed Jeremy with bipolar 1 disorder and alcohol use disorder. R. 1074. Dr. Nimer adjusted Jeremy's medications and counseled Jeremy on alcohol abstinence. R. 1074–75. Follow-up appointments with Dr. Nimer in October and December 2020 yielded similar results. R. 1064, 1067. Jeremy continued to decline Dr. Nimer's suggestions for alcohol cessation and psychiatric intervention. Id. In December 2020, Dr. Nimer noted that Jeremy was feeling better overall and had stopped taking his medication. R. 1062.

7

In October 2020, Jeremy returned to Blue Ridge for an annual psychosocial reassessment. R. 893–99. The provider noted that "Jeremy would benefit from continued services as he has chronic diagnoses that [a]ffect his daily living activities and his ability to form relationships." R. 899.

2. Medical Opinions

In February 2020, state agency consultative examiner Dr. Gardener found Jeremy could "perform simple and repetitive work tasks" and could "maintain regular attendance in the workplace when remaining abstinent from substances." R. 776. Dr. Gardener also found that Jeremy can perform work activities without special supervision and can complete a normal workday and workweek without interruptions from his mental impairments when remaining abstinent from substances. R. 776–77. Dr. Gardener stated that Jeremy could interact with co-workers with no more than a moderate level of impairment but is "not able to deal with the usual stresses encountered in competitive work as he remains alcohol dependent." R. 777. The ALJ found these opinions persuasive "because they are consistent with [Dr. Gardener's] examination findings and with the record as a whole, which shows only routine and conservative mental health treatment." R. 177.

In March 2020 and May 2020, respectively, state agency psychological consultants Alan Entin, Ph.D, and Leslie Montgomery, Ph.D., found Jeremy moderately limited in his ability to understand and remember detailed instructions but able to perform simple, routine, and repetitive work in a stable environment. R. 216–17, 245–46. The ALJ found these opinions persuasive because they are consistent with Dr. Gardener's findings and the record. R. 177.

In March 2020 and May 2020, respectively, state agency medical consultants Michael Koch, M.D., and Jack Hutcheson, M.D., found that Jeremy did not have any severe physical

impairments. R. 213, 242. The ALJ found these opinions persuasive because "they are consistent with the limited routine and conservative treatment for [Jeremy]'s hypertension, asthma, and back pain during the period at issue." R. 178.

### B. Mental Impairments under SSR 96-8P

Jeremy argues that the ALJ failed to properly assess his mental impairments as required by SSR 96-8P.[9] See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Jeremy asserts that the ALJ failed to explain how his RFC findings account for Jeremy's moderate limitations in concentration, persistence, or pace and in interacting with others. Pl.'s Br. at 17–19, Dkt. 16. Jeremy further argues that because the ALJ did not consider his moderate limitations, the ALJ failed to ask the vocational expert proper hypothetical questions. Pl.'s Br. at 22–23, Dkt. 16. Jeremy argues that the ALJ erred by not providing a definition of "production-paced work" in the RFC. Id. at 20–21. Finally, Jeremy asserts that the ALJ ignored evidence from Dr. Marks. Pl.'s Br. at 25–27, Dkt. 16. The Commissioner counters that the ALJ's decision is "supported by substantial evidence, and it should be affirmed." Def.'s Br. at 21, Dkt. 18.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR

---

[9] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe, 826 F.3d at 189 (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarifies that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. In contrast, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Shinaberry further confirms that Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain the decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

Here, the ALJ explained why Jeremy's moderate limitations in concentration, persistence, or pace, and in interacting with others did not translate into a limitation in the RFC beyond that imposed.[10] Addressing Jeremy's moderate limitations in concentration, persistence, or pace, the ALJ specifically acknowledged that Jeremy "has difficulties with his ability to concentrate and completing tasks." R. 174. However, the ALJ noted that Jeremy is able to live alone, perform household chores, handle his finances, and watch television programs. Id. The ALJ cited Dr. Gardener's conclusion that Jeremy would have no impairment in concentration, persistence, or pace when performing simple and repetitive tasks, a conclusion that both Dr. Entin and Dr. Montgomery also reached. R. 176–77. The ALJ also noted that on exam, doctors found that Jeremy's memory was only mildly impaired and that his speech, mood, and thought content were appropriate. Id.

Addressing Jeremy's moderate limitation in interacting with others, the ALJ specifically acknowledged that "[a] third party Function Report indicated that [Jeremy] had difficulties getting along with others." R. 174. However, the ALJ noted that Jeremy can regularly go out alone, shop, attend medical appointments, and exercise at the gym. R. 174. The ALJ also cited Dr. Gardner's opinion that Jeremy could interact with co-workers and the public "with no more than a moderate impairment of social interaction[.]" R. 177. Contrary to Jeremy's argument, the ALJ explained his reasoning and the RFC, including specific references to the medical records and opinions. The ALJ explained that because the record shows difficulty in concentration, persistence, or pace, and in interacting with others, Jeremy has been limited to jobs with simple

---

[10] Jeremy also argues the ALJ "expressed [Jeremy]'s RFC first and then concluded the limitations caused by his impairments were consistent with that RFC." Pl.'s Br. at 21, Dkt. 16. However, this assertion is not supported by the record. The ALJ explicitly discussed Jeremy's mild and moderate limitations in conjunction with his medical record. R. 174–75. Additionally, the ALJ discussed the opinions of medical experts who found that the limitations the ALJ articulated in the RFC would address Jeremy's impairments. R. 177–78.

and routine tasks, no timed or production-paced work, few changes in processes, procedures, or environment, and no more than occasional interactions with co-workers, supervisors, or the public.[11] R. 175.

Jeremy further asserts that because the ALJ did not consider his moderate limitations in concentration, persistence, or pace, and in interacting with others, the ALJ failed to "pose proper hypothetical questions to the vocational expert." Pl.'s Br. at 22, Dkt. 16. At the hearing, the ALJ asked the vocational expert, Asheley Wells, the following question:

> "If you would assume an individual the claimant's age, education, and work experience who is capable of light or medium exertion, but non-exertionally would be limited to a simple routine[,] one and two-step tasks in a stable work environment with no complex instructions, processes, or procedures; no timed or production-paced work; no teamwork; few changes in the work processes or procedures or environment; and not more than occasional interaction with co-workers, supervisors, or the public, would that person find work in the national economy?

R. 194–95. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). Here, the ALJ based his hypothetical on the evidence in the record. As discussed, the ALJ acknowledged that the record indicated that Jeremy had difficulty with concentration, persistence, or pace, and in interacting with others. Those limitations were addressed in

---

[11] Jeremy argues that the ALJ failed to address his ability to sustain work and not simply perform work. Pl.'s Br. at 23–25, Dkt. 16. The Commissioner asserts that this argument requires little discussion because "[i]f [Jeremy] were unable to sustain work over an eight-hour day, []he would have been found disabled." Def.'s Br. at 15, Dkt. 18. I agree with the Commissioner. The purpose of the RFC is to assess "an individual's ability to do sustained work-related physical and metal activities in a work setting on a regular and continuing basis" meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." See 20 C.F.R. §§ 404.1545(b); SSR 96-8, 1996 WL 374184, at *1-2. Here, the ALJ determined that Jeremy could perform sustained work activities in an ordinary work setting on a regular and continuing basis with certain limitations and accommodations. The ALJ provided a narrative discussion explaining his conclusions and the evidence supporting the RFC determination.

the ALJ's hypothetical when asking for jobs that had simple tasks, no timed work, few changes in the work environment, and limited interactions with co-workers, supervisors, and the public. The ALJ's hypothetical limitations were supported by the record and considered Jeremy's impairments.

Jeremy also argues that the ALJ erred by not explaining what is meant by production-paced work in the RFC. Jeremy cites Thomas v. Berryhill, 916 F.3d 307 (4th Cir. 2019) in support of his argument, a case which the Fourth Circuit overturned due in part to the ALJ not supplying a definition for the terms "production rate" and "demand pace" used in the RFC. Jeremy argues that production-paced work "is not a common term and requires elaboration as to what exactly the ALJ meant regarding this limitation." Pl.'s Br. at 20, Dkt. 16. However, this case is not the same as Thomas. Although the ALJ did not provide a definition for production-paced work, the ALJ provided additional context that Jeremy is unable to perform timed work, is limited to simple and routine tasks, can have limited interactions with co-workers, and cannot work in an environment with complex procedures, processes, or instructions. R. 175. These additional restrictions help to explain the limitations intended by the ALJ in this case. See Perry v. Berryhill, 765 F. App'x 869, 872 (4th Cir. 2019) (reasoning that in contrast to Thomas, the ALJ in Sizemore v. Beryhill, 878 F. 3d 72 80–81 (4th Cir. 2017), "provided additional context, explaining that the claimant could perform work only in a 'low stress' setting, without any 'fast-paced work' or 'public contact,' to account for moderate limitations in concentration, persistence and pace. Those descriptors helped to explain the restriction intended by the ALJ, and allowed us to evaluate whether that restriction adequately accounted for the claimant's limitations.") (internal citations omitted); see also O'Dell v. Saul, No. 5:20-CV-00048-KDB, 2021 WL 1233480, at *5 (W.D.N.C. Apr. 1, 2021) ("[T]he inclusion of a 'non-production work' limitation

13

in the RFC is not categorically reversable, but must be evaluated on a case-by-case basis to see if there is adequate explanation and substantial evidence to support the restriction."). Here, the ALJ's limitations in the RFC, when taken as a whole, help to define production-paced work.

Finally, Jeremy argues that the ALJ "ignored entirely" the evidence from Dr. Marks and erred in concluding that Jeremy does not have an intellectual disability. Pl.'s Br. at 25, Dkt. 16. Jeremy reasons that Dr. Marks's opinions are supported by the records of Ms. Guilliams and Dr. Gardener, who both noted the severity of Jeremy's impairments. Id. at 26.

Jeremy submitted his application in August 2019, thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[12] When making an RFC assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide, however, that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. Id. "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not

---

[12] 20 C.F.R. §§ 401.1520c, 416.920c applies to claims filed on or after March 27, 2017. For claims filed before this date, the rules in § 404.1527 apply.

14

required to explain the consideration of the other three factors, including relationship with the claimant, specialization, and other factors such as an understanding of the disability program's policies and evidentiary requirements. Id.[13]

Here, the ALJ properly considered Dr. Marks's opinions under the new regulations. The ALJ discussed Dr. Marks's opinions and provided specific reasons why he found none of them persuasive. Regarding Dr. Marks's opinion that Jeremy had a mild intellectual disability, the ALJ noted that these results "were inconsistent with the records from Blue Ridge Behavioral Health that indicated [Jeremy]'s intelligence was deemed average and his memory was intact." R. 173. The ALJ further reasoned that no treating provider diagnosed Jeremy with an intellectual disability. Id. The ALJ discussed Jeremy's medical records, including the treatment notes discussing Jeremy's memory and intelligence. While the record reflects that Jeremy had difficulty remembering things, concentrating, and interacting with others, R. 620, 718, 775, 786, 920, 1059–60, the record also reflects that Jeremy lived by himself, took care of his own apartment, and handled his own bills and finances, and multiple specialists concluded that Jeremy would have no impairment in completing simple and repetitive tasks. R. 216–17, 245–46, 773, 775, 786. The ALJ also considered the opinions of Dr. Gardener, Dr. Entin, and Dr. Montgomery, which he found persuasive because there were consistent with each other and with the record as a whole and because Jeremy never received inpatient psychiatric care. R. 177. The ALJ did not simply discount Dr. Marks's opinions, but considered the opinions in the record and explained which opinions he found persuasive and why.

---

[13] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well–supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3).

The ALJ adequately explained why he found Dr. Marks's opinion not persuasive, and I will not reweigh the evidence. The RFC assessment lies squarely with the ALJ, not with any medical provider or examiner. 20 C.F.R. §§ 404.1546(c), 416.946(c); see Felton-Miller v. Astrue, 459 F. App'x 226, 230-231 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC."). To this end, when conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the Court defers to the ALJ's decision. Shinaberry v. Saul, 952 F.3d 113, 123 (4th Cir. 2020).

### C. Subjective Allegations

Jeremy argues that the ALJ's assessment of his allegations is not supported by substantial evidence. Jeremy claims that the ALJ's "evaluation of [Jeremy]'s allegations consists of conclusory statements regarding [his] functional capacity with respect to various impairments without an explanation as to how he arrived at his conclusions." Pl.'s Br. at 31–32, Dkt. 16. Jeremy further argues that "the activities referenced by the ALJ are not performed on a sustained basis commiserate with substantial gainful work activity and consequently, do not establish [Jeremy] can sustain a typical 40-hour workweek." Id. at 29. The Commissioner counters that the ALJ followed the regulatory evaluation process. Def.'s Br. at 22, Dkt. 18.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[14] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the

---

[14] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to

ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

     Here, the ALJ found that Jeremy's medically determinable impairments could reasonably be expected to cause the alleged symptoms. R. 176. However, the ALJ found that Jeremy's statements concerning the intensity, persistence, and limiting effects of those symptoms were not consistent with the record. Id. Despite Jeremy's claim that "the ALJ concluded [Jeremy]'s impairments are controlled with medication," Pl.'s Br. at 28, Dkt. 16, the ALJ actually wrote that Jeremy's "symptoms of depression and anxiety are relatively well controlled with his psychotropic medications and are even further reduced with reduced alcohol consumption and/or abstinence." R. 177. Jeremy correctly cites multiple records where his medications were not working and he was still experiencing symptoms from his mental health impairments. Pl.'s Br. at 28, Dkt. 16 (citing R. 785–86, 1059). However, these records are from April 2020 and May 2020. Jeremy does not cite further records, such as his visit with Dr. Nimer in December 2020, where Dr. Nimer noted that "[o]verall patient is feeling better." R. 1062. At that visit, Dr. Nimer also noted that Jeremy began working out six days a week and had lost 10 pounds. Id. Although

---

produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

17

Jeremy is correct that his medications were not working at certain points in time, the record reflects that by the end of 2020, Jeremy's condition was improving, and this evidence cannot be ignored.

Jeremy points to Brown v. Comm'r, 873 F.3d 251 (4th Cir. 2017) and similar cases to support his argument that the ALJ failed to acknowledge that "the activities [such as living alone, performing chores, and managing his finances] referenced by the ALJ are not performed on a sustained basis commiserate with substantial gainful work activity and consequently, do not establish [Jeremy] can sustain a typical 40-hour workweek." Pl.'s Br. at 29, Dkt. 16. Jeremy emphasizes his testimony that he only heats items in the microwave for his meals and that someone drives him to the grocery store, as well as statements from his third-party function report regarding his limited activities. Id. The ALJ acknowledged Jeremy's difficulty in getting along with others, references in the record that Jeremy's hygiene was not satisfactory, and that Jeremy could perform certain limited functions like preparing "simple meals." R. 174. Further, unlike in Brown, the ALJ pointed to more than Jeremy's daily activities to discount his subjective allegations.[15] Beyond the activities of daily living, the ALJ noted that medical evidence was inconsistent with Jeremy's allegations about the extent of his impairments. R. 176. Jeremy's allegations of disability were also inconsistent with the state agency doctors, Drs. Gardener, Entin, and Montgomery, who all found Jeremy capable of working in a limited capacity. Finally, the ALJ may properly rely on evidence regarding a plaintiff's routine, non-work activities in rejecting a claim of disability. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).

---

[15] Also, unlike in Brown, the ALJ here did not fail to consider any doctor's opinions, or wrongly credit a psychiatric medical expert's testimony over the "consistent opinions of [five] treating and examining sources" who found disabling physical limitations. Brown, 873 F.3d at 266.

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Jeremy's subjective complaints with substantial evidence, and that Jeremy is capable of performing work at the level stated in the ALJ's opinion.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Thomas T. Cullen, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days.  Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered: January 3, 2023

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge